# United States Court of Appeals
## For the First Circuit

No. 04-2542

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL G. SHOUP,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lipez, Circuit Judge,

Cyr, Senior Circuit Judge,

and Singal,* District Judge.

    Peter B. Krupp, with whom Lurie & Krupp, LLP was on brief for appellant.
    Cynthia A. Young, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief for appellee.

February 7, 2007

---

*Of the District of Maine, sitting by designation.

**CYR**, <u>**Senior Circuit Judge**</u>.  Defendant-appellant Daniel Shoup challenges the conviction, as well as the sentence, imposed upon him for one count of being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1).  We affirm the conviction, and remand for resentencing in light of <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005).

**I**

<u>**BACKGROUND**</u>

Shortly after midnight on March 17, 2002, Shoup was driving his SUV, a black Ford Tahoe bearing license plate 8549 VZ, through downtown Salem, Massachusetts, when he encountered Bard Carvalho and several friends walking from a local bar to the home of one of his friends.  Shoup leaned out the car window and yelled "homo" at the group.  Thinking it was a joke, Carvalho yelled back: "You're a homo."  The Carvalho group continued walking until they arrived outside his friend's house on Lynde Street.  Shoup pulled up in his SUV, exited the vehicle, approached Carvalho, and stated: "Do you have a problem with me?"  Carvalho observed what appeared to be a handgun protruding from Shoup's waistband, with the handle wrapped in silver duct tape.  Determined to get away from the dangerous situation quickly, Carvalho grabbed his friend Tamsen's wrist, led her inside the apartment, and immediately called 911. Carvalho's other friends remained outside talking with Shoup.

Carvalho promptly advised the 911 dispatcher that (i) a

man driving a car bearing license plate 8549 VZ had just threatened him and his friends; (ii) the man "has a gun in his pants"; and (iii) the vehicle in question is a black Tahoe. By this time, one or two minutes had elapsed since Carvalho left his friends outside, and Carvalho observed through the apartment window that Shoup was driving away. Carvalho advised the dispatcher: "I'm sorry I called 9-1-1; it's probably not that severe, but he had a gun in his pants and he was threatening us." Carvalho then notified the dispatcher that he was observing Shoup taking a left from Lynde Street onto North Street. Carvalho described the man as a 30 to 35 year old Caucasian (which matches Shoup's physical appearance), and thought that he may have been intoxicated. When the dispatcher asked Carvalho if the man had brandished the gun, Carvalho replied: "No he just had it. He pulled the coat back and had it ... like exposed. . . . There was some . . . silver duct tape on like, I think on the gun." The dispatcher told Carvalho that a police officer would be sent to Lynde Street, and rang off.

Within fifteen to thirty minutes, the police stopped Shoup's SUV in downtown Salem. When asked if he knew why he was stopped, Shoup replied: "Yes". Shoup was carrying a folding knife in his right front pant's pocket, with only the clip exposed. The police discovered a black police baton under the front seat of the vehicle, as well as two loaded and holstered handguns inside the console between the driver's seat and the front passenger seat.

-3-

One firearm had a silver-colored handle.

Shoup was indicted on one count of being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1). At trial, Carvalho testified that he had observed Shoup carrying what appeared to be a gun in his waistband. The government corroborated that testimony by playing the tape of the Carvalho 911 phone call. The arresting officers testified to stopping the Shoup vehicle shortly after the 911 call, and to the seizure of the two handguns from the console.

The defense called Shoup's brother, John, who testified that he had borrowed Dan Shoup's SUV on March 15 because he intended to take his family on a beach outing the following day, that he used the SUV on that day to take a friend named Sean Nobile on errands, and that during this trip he was surprised to discover that Nobile was carrying two firearms. John further testified that he told Nobile to put the guns in the console and lock it, but when John dropped Nobile off at his home, both of them had forgotten that the guns were still in the console. John testified that he used the SUV on March 16 to take his family for an outing, then returned the car to Dan Shoup's house late in the day on March 16, but forgot to tell Dan that the two guns were in the locked console. Shoup's former girlfriend, Colleen Dowgos, testified for the defense that Nobile contacted her about twelve days after Shoup's arrest, and told her that he had paid the $20,000 bail to

-4-

get Shoup out of jail on state charges.  Since Shoup meanwhile had been re-arrested on federal charges, Dowgos gave Nobile the keys to Shoup's apartment because Nobile wanted to retrieve some property he had left there.  Because Sean Nobile invoked his Fifth Amendment right against self-incrimination, the district court declared him an "unavailable witness."

The jury found Shoup guilty.  At sentencing, which occurred prior to the decision in United States v. Booker, 543 U.S. 220 (2005), the district court sentenced Shoup at the low end of the applicable guidelines range (i.e., 210 months), but noted that Booker might rule the Sentencing Guidelines unconstitutional, in which case the court would impose the statutory minimum sentence of 180 months. Shoup now appeals from his conviction and sentence.

**II**

**DISCUSSION**

**A.   Admissibility of 911 Tape Transcript**

Shoup first contends that the district court erred in allowing the government to introduce in evidence the audiotape and transcript of Carvalho's 911 call, because they do not qualify under any exclusion from the hearsay rule, see Fed. R. Evid. 801(d)(1)(A) (prior statement inconsistent with trial testimony); id. 801(d)(1)(B) (prior consistent statement to rebut charge of recent fabrication); id. 801(d)(1)(C) (statement of identification), and their admission constitutes reversible error

because Carvalho's in-court testimony was much more tentative in identifying the object in Shoup's waistband as a handgun (or as one of the two guns in evidence), and standing alone, would not have persuaded the jury to reject the defense's theory that the two guns belonged to Nobile and that Shoup was unaware of their presence in the locked console of the car.

As Shoup did not object to the admission of the 911 recording or transcript, we review his challenge for plain error only, and will reverse only if he demonstrates that (i) there was error; (ii) the error was obvious; and (iii) the error affected Shoup's substantial rights by altering the outcome of the trial. See United States v. Bartos, 417 F.3d 34, 36 (1st Cir. 2005) (noting that, provided these three conditions are satisfied, the court may in its discretion, reverse to prevent a miscarriage of justice) (citing United States v. Olano, 507 U.S. 725, 734-35 (1993)).

Shoup's argument fails, since he can show neither that there was error, nor if there were an error, that it was obvious. The government contends that the 911 call satisfies either the "excited utterance" or the "present sense impression" exception to the hearsay rule. See Fed. R. Evid. 803(2) (noting that a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is an exception to the hearsay rule); id.

803(1) (noting that a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter[,]" is an exception to the hearsay rule).

Shoup counters, inter alia, that the 911 recording would not have been admissible under either exception since too much time had elapsed between the time Shoup confronted Carvalho with the gun and the time Carvalho spoke with the 911 dispatcher. Rules 803(1) and (2) do not require that the statement occur contemporaneously with the event, however, since "in many, if not most, instances precise contemporaneity is not possible and hence a slight [time] lapse is allowable." Fed. R. Evid. 803(1) advisory committee's note; see United States v. Taveras, 380 F.3d 532, 537 (1st Cir. 2004) (noting that permissible delay may in fact be even "a few minutes" or more). Given Carvalho's testimony that Shoup drove away only one or two minutes into Carvalho's 911 call, Carvalho's 911 call came immediately after his confrontation with Shoup, and while Carvalho's friends were still outside with Shoup and remained at risk. See United States v. Rondeau, 430 F.3d 44, 48 (1st Cir. 2005) (finding no error in admission of 911 call "made as or immediately after [defendant] threatened [the caller] with the gun"). Carvalho began the call by declaring that Shoup "has a gun in his pants."

Further, the record contains no other indication that the

911 recording lacked evidentiary reliability. The defense stipulated to the accuracy of the transcript of the 911 call. The Carvalho in-court testimony was entirely consistent with the 911 tape, and in many respects more detailed. Id. (noting that 911 caller never changed his account of the events). Carvalho testified that he "saw something in his [Shoup's] waistband that I believed at the time was a pistol," with silver duct tape on its handle. Although Carvalho conceded that he had observed the gun Shoup was carrying in his waistband for about five seconds and could not identify it positively as either of the two handguns in evidence, he further testified that, except for it appearing smaller than he remembered, the gun with the silver-colored handle "looks like the visual memory that I have of [the gun]." Further, the police managed to corroborate the other facts stated in the 911 call, by stopping a black Ford Tahoe with licence plate 8549 VZ in the nearby downtown area within minutes of the Carvalho call and by seizing a gun with a silver-colored handle from the vehicle. Id. at 48-49 (noting that police corroborated 911 call by locating defendant near caller's building in a car matching caller's description, and a gun which the caller identified). Given these circumstances, it is indeed doubtful that admission of the 911 call was error at all, let alone plain error.

In any event, since the time-lapse delimitation on an "excited utterance" or a "present sense impression" is by no means

a bright-line test, see Fed. R. Evid. 803(1) advisory committee's note ("'How long can excitement prevail? Obviously there can be no pat answers and the character of the transaction or event will largely determine the significance of the time factor.'") (citation omitted), Shoup cannot demonstrate that the district court would have committed "obvious" error had it determined that the 911 call was admissible under these two hearsay exceptions. See, e.g., United States v. Abraham, 386 F.3d 1033, 1037 (11th Cir. 2004) (finding no plain error where 911 caller reported that defendant used a gun to threaten his girlfriend's mother and sister), cert. denied, 126 S. Ct. 417 (2005); accord United States v. Hartmann, 958 F.2d 774, 784 (7th Cir. 1992) (finding no plain error where declarant just overheard plot to murder him). By failing to lodge a contemporaneous objection to the admission of the 911 tape and transcript, Shoup precluded (thus relieved) the government from presenting its best evidence as to the time-lapse issue, and the district court from making the attendant findings of fact. For these reasons, we perceive no plain error.

## B.   The Prosecutor's Closing Argument

As Nobile invoked his Fifth Amendment right against self-incrimination, he became an "unavailable" witness for the defense. See United States v. DeLuca, 137 F.3d 24, 38 (1st Cir. 1998). However, in its closing argument the government stated: "If you believe what these [defense] witnesses testified to, you'd have to

believe, first of all, that this <u>phantom</u> Sean Nobile put these guns in the car." (Emphasis added.) In its rebuttal argument, the government once again referred to "this phantom Sean Nobile." Shoup now contends that these references constituted reversible error because they improperly invited the jury to infer either that Nobile was a fictitious person that the defense invented to exonerate Shoup, or that the defense had chosen not to call Nobile to testify because his testimony would have been adverse to the defense.

Once again, Shoup made no contemporaneous objection to the prosecutor's "phantom" remarks, and we review the present challenge for plain error only, and will not reverse unless the prosecutor's remarks "'so poisoned the well that the trial's outcome was likely affected.'" <u>United States</u> v. <u>Henderson</u>, 320 F.3d 92, 107 (1st Cir. 2003) (citation omitted). Appellate reversal for plain error is extremely rare, and is confined to "blockbuster" errors, not "ordinary backfires," <u>United States</u> v. <u>Ortiz</u>, 447 F.3d 28, 35-36 (1st Cir. 2006) (noting that criminal defendants are not entitled to a "perfect" trial).

The government normally may not invite the jury to make any inference regarding the absence of a witness whose unavailability has arisen because of the invocation of his Fifth Amendment right against self-incrimination. <u>See</u> <u>United States</u> v. <u>Johnson</u>, 488 F.2d 1206, 1211 (1st Cir. 1973) ("Neither side has the

right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him."). The "phantom" term necessarily implied that Nobile either did not exist, or that, if he existed and testified at trial, he would provide no support for the defense theory. Therefore, the government concedes (and we agree) that the prosecutor's "phantom" references were extremely ill-advised.

In assessing whether a prosecutor's improper closing remarks necessitate reversal, however, we must consider, inter alia, (i) the severity of the prosecutor's misconduct; (ii) whether deliberate or inadvertent; (iii) the context in which it occurred; (iv) the likely effect of any curative instructions; and (v) the strength of the government's evidence of guilt. See United States v. Thompson, 449 F.3d 267, 271 (1st Cir. 2006); United States v. Zhanqi, 189 F.3d 71, 82 (1st Cir. 1999) (noting that new trial should be granted only if "'prosecutorial misconduct likely affected the trial's outcome or to deter such misconduct in the future'") (citation omitted).

Viewed through this narrow lens of appellate review, the prosecutor's references to "phantom" are relatively benign. The prosecutor did not focus at length on the failure of the defense to produce the witness. The prosecutor used the word "phantom" but twice, with no further elaboration, nor is there any indication

that its use was deliberate, rather than a mistake.  See United

States v. Hernandez, 218 F.3d 58, 70 (1st Cir. 2000) (noting that

word "unknown" was an "isolated" reference, hence "most likely non-

deliberate"); United States v. Cruz, 156 F.3d 22, 31 (1st Cir.

1998) (noting that deterrent prong of plain error analysis requires

that defendant make particularized allegations of prosecutorial

"bad faith").[1]  We have refused to find plain error in cases where

the prosecutor has been far more explicit in shifting the burden of

proof to defendant.  See, e.g., United States v. Jimenez-Torres,

435 F.3d 3, 11-12 (1st Cir. 2006) (finding no plain error even

though government counsel argued that defense counsel "had the same

opportunity to call these [absent] witnesses," and noting that

appellate assessment of the prejudice attending such absent-

witnesses comments is always "a matter 'of degree'") (citation

omitted).  Furthermore, the fact that defense counsel did not

object to the usage increases the likelihood that the effect on the

jury was likewise fleeting and evanescent.  See United States v.

Procopio, 88 F.3d 21, 31 (1st Cir. 1996) ("The fact that the

defense did not object also may suggest that, in the conditions of

the courtroom, the passage in question passed by as mere

_____

[1]The parties originally anticipated that their closing
arguments would be made on the third day of trial, but when the
presentation of evidence unexpectedly ended early on day two, the
district court allowed counsel only twenty minutes to script and
review their closing arguments.

-12-

rhetoric.").[2]

Yet more importantly, the prosecutor did not elaborate on or otherwise exploit the fact that Nobile did not testify, and/or that Nobile's testimony presumably would be adverse to the defense. Rather, the prosecutor immediately focused on the fact that, even if Nobile's testimony had confirmed the defense's theory, "the testimony [supporting that theory] is both incredible and irrelevant," since "[t]he question in this case isn't ownership [of the guns][,] [i]t is possession."[3]  Given the Carvalho testimony that he had seen a gun in Shoup's waistband, the prosecutor aptly noted that it was irrelevant who owned the gun, and that Shoup was guilty of section 922(g)(1) possession even if he had found the Nobile gun in the console and brandished it during his encounter with Carvalho.

Although Shoup's failure to object to the prosecutor's remarks precluded the district court from delivering a targeted curative instruction, the court nonetheless instructed the jury in closing that the government had the burden to prove Shoup's guilt

---

[2]Indeed, defense counsel himself repeated the word "phantom" in his closing argument, without any indication that he objected to the government's prior usage.

[3]The prosecutor called attention to the seeming implausibility of Shoup's brother's testimony that he simply had forgotten that Nobile had placed the two guns in the car which he used to take his family on a beach outing, and that he simply forgot to tell Shoup about the guns when he returned the car, even though both he and Shoup were convicted felons prohibited from possessing firearms.

beyond a reasonable doubt and that Shoup had no burden of proof whatsoever. See Jimenez-Torres, 435 F.3d at 12 (noting that, where defendant's failure to object prevents court from giving contemporaneous and specific curative instruction, generic jury instructions given after closing arguments should be weighed in mitigation of prejudice under "plain error" analysis).[4]

Finally, the evidence of Shoup's gun possession – viz., the Carvalho trial testimony and the 911 tape/transcript – was quite strong. Carvalho was an eyewitness. Carvalho testified at trial that the silver-handled gun in evidence was the object he had seen in Shoup's waistband. The defense attempted to undermine Carvalho's observations by noting that he erroneously believed at the time of the confrontation that the gun handle was wrapped in silver duct tape, but the gun seized from the Shoup vehicle had a silver-colored handle, and Carvalho had observed the gun for only five seconds at nighttime. See United States v. Hall, 165 F.3d 1095, 1107 (7th Cir. 1999) (noting that question of reliability of eyewitness's perception and memory may be tested adequately through

---

[4]The charge provided, in pertinent part: "In a criminal case, the burden of proving guilt is on the government. It has that burden throughout trial. A defendant never has the burden of proving his innocence. The right of a defendant to put the government to its proof is one of the most fundamental guarantees of our Constitution. This means that a defendant cannot be compelled to produce evidence, nor can he be compelled to testify. Thus, you may not draw an inference of guilt from the fact that Mr. Shoup did not testify."

cross-examination, and resolved by jury "through common-sense evaluation").

Carvalho also provided the 911 dispatcher with contemporaneous descriptions of Shoup, his gun, his vehicle, its license plate, and the direction in which Shoup departed the scene of their confrontation. These details were precisely corroborated when the police stopped the Shoup car within a short time and distance from the scene. When apprehended, Shoup told the police that he knew why the police were stopping him. A silver-handled gun was seized from the car, and an inventory search revealed no other object fitting the description of the object Carvalho observed earlier in Shoup's waistband. Even if the jury had believed the defense argument that Shoup's brother had locked the guns in the vehicle's console, there was no evidence to rebut the common sense inference that Shoup would have possessed a key to the console in his own vehicle.

In these circumstances, we can discern no sound grounds for reversal. See United States v. Young, 470 U.S. 1, 15 (1985) ("[T]he plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'") (citation omitted).

## C. The Pre-Booker Sentence

Shoup was sentenced prior to the decision in United

-15-

States v. Booker, 543 U.S. 220 (2005), which held that the federal Sentencing Guidelines are unconstitutional to the extent mandatory, as distinguished from advisory.  As Shoup properly preserved his Booker challenge in the district court, the government must bear the burden of establishing beyond a reasonable doubt that the district court would not have imposed a lesser sentence if it had acted under an advisory – rather than mandatory – Guidelines regime.  See United States v. Fornia-Castillo, 408 F.3d 52, 73 (1st Cir. 2005).  The government acknowledges that it cannot meet this burden given that the district court sentenced Shoup at the low end of the applicable guidelines range, and expressly stated that it would impose the statutory minimum 180-month sentence if the guidelines were invalidated by Booker.  Accordingly, we vacate the sentence and remand for resentencing in light of Booker.[5]

**The judgment of conviction is affirmed.  The sentence is vacated, and the case is remanded for resentencing in accordance with the opinion herein**.

---

[5]Shoup also contends that, upon remand, the district court may not sentence him on the basis of his prior convictions, because the government failed to prove the convictions to the jury beyond a reasonable doubt.  This argument is foreclosed by Almendarez-Torres v. United States, 523 U.S. 224 (1998), and we have held en banc that we are bound by Almendarez-Torres until the Supreme Court overrules it.  See, e.g., United States v. Peralta, 457 F.3d 169, 172 (1st Cir. 2006) (citing United States v. Jimenez-Beltre, 440 F.3d 514, 518-19 (1st Cir. 2006) (en banc)).

-16-